UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| WARREN MURPHY,<br><br>      Plaintiff,<br><br>      v.<br><br>FOREST RIVER INC.,<br><br>      Defendant. | CASE NO. 1:24-CV-170-HAB |

**OPINION AND ORDER**

Threatening to shoot co-workers—or, at least, screaming out loud in a work setting that co-workers should be shot—might reasonably be considered a fireable offense. But although Plaintiff Warren Murphy ("Murphy"), who co-workers knew to be a gun aficionado, did just that, he insists his blowup is not why Defendant Forest River Inc., ("Forest River") let him go. Instead, Murphy claims his outburst and the months of dialogue that followed exposed his disability to Forest River, and that it discriminatorily fired him on that basis. He sued alleging the company violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601.

Before the Court is Forest River's motion for summary judgment. (ECF No. 24). The company argues that Murphy's tirade disqualified him from ADA protection, that it did not discriminate even if he was qualified, and that Murphy has not established an actionable FMLA claim. For the reasons below, the motion will be GRANTED.

**I.   Factual Background**

On May 24, 2023, Murphy, an assistant director of parts, service, and warranty at Forest River, had a "complete meltdown" in his office when he lost work on his computer. (ECF No. 26,

¶¶ 4, 38). This five-minute long screaming episode—which happened in earshot of co-workers—featured Murphy unleashing vulgar and threatening language at Forest River's IT employees. *Id.* ¶¶ 39–41. Murphy and Forest River dispute what *exact* words were uttered. But all agree Murphy called the IT employees "motherfuckers" and said that "they should be shot."[1] *Id.* ¶¶ 39–40. This tirade violated Forest River's Workplace Violence Policy, and Murphy concedes this violation gave Forest River authority to fire him. (ECF No. 28, ¶¶ 96–97). After his outburst, Murphy removed himself from the situation. (ECF No. 26, ¶ 43). He left the office for a time, self-reported the incident to one of his supervisors, and returned later that day. (ECF No. 28, ¶¶ 124–25). While he was gone, he made an appointment with his therapist Julie Albano ("Albano"), who he had been seeing for about three months. (ECF No. 26, ¶ 44; No. 28, ¶ 104).

The next day, Murphy met with another supervisor, Doug Gaeddert ("Gaeddert"), and two members of Forest River's Department of Human Resources ("HR")—David Besinger ("Besinger") and Jorje Lizarazo ("Lizarazo")—to discuss his outburst. (ECF No. 26, ¶ 46). Murphy did not mention any disability or medication in this meeting. *Id.* ¶¶ 49–50. When the meeting ended, Murphy was told to work from home while HR investigated the incident. *Id.* ¶ 51. Albano shortly thereafter sent a letter to Forest River, advising the company that Murphy was her patient and that they had been working on managing Murphy's anger. (ECF No. 28-16). The letter suggested ways Forest River could help Murphy avoid letting his anger boil over again. *Id.* Murphy had years earlier received diagnoses for major depressive disorder and anxiety, but the letter did not mention any disability or mental health diagnosis. (ECF Nos. 28-6, at 8–10; 28-16). After Albano sent this

---

[1] In his Response to Statement of Material Facts, Murphy disputes the admissibility of statements he made that can be found in his therapist's notes. (ECF No. 28, ¶ 39). Whether this is hearsay or not, this argument is a red herring. The therapy notes were shown to Murphy during his deposition, and those notes do reference Murphy's recollection of what he said during his outburst. (ECF No. 26-1, at 64). But nonetheless, Murphy admitted having said "they should be shot" in response to a question that did not refer to the content of the notes. *Id.* at 22:9–11.

2

letter, two processes began: Forest River's investigation of the incident and the dialogue between Forest River and Murphy.

The investigation did not involve many components. Lizarazo spoke to a handful of employees who heard Murphy's blowup and followed up with them two months later about the possibility of Murphy returning to work. (ECF No. 26, ¶¶ 53, 81). Each time, Lizarazo reported his findings to Besinger. *Id.* ¶ 53. The investigation also revealed that Murphy was known to be an avid gun owner, as he often talked about guns with co-workers and handed out cards for his gunsmithing business. *Id.* ¶ 34. Murphy estimates that he owned at least twenty-five guns at the time of the outburst. *Id.* ¶ 31.

The dialogue, on the other hand, was much more drawn out. After Murphy worked from home for a short time and spent two weeks away for National Guard training, he and Albano had a phone call with Besinger and Lizarazo to discuss how Murphy might return to work. (ECF No. 28, ¶¶ 148–49). Albano suggested that Murphy be allowed to work from home. *Id.* ¶ 152. Forest River promptly shot that idea down, and informed Murphy that Albano's other suggestions from her letter in May were also unworkable. (ECF No. 26, ¶¶ 68–69). At the end of the meeting, Forest River told Murphy that he would need to submit "something, anything . . . saying that . . . [he] was able to return to work" and "wouldn't harm himself or someone else." (ECF No. 28, ¶¶ 67, 151). The company also informed him that he would be placed on FMLA leave while the investigation continued. *Id.* ¶ 190.

Besinger then filled out the required designation notice to put Murphy on FMLA leave. (ECF No. 28-8). The form included boxes for whether Forest River would or would not require Murphy to provide a fitness-for-duty certification from a healthcare provider verifying that he could resume work. *Id.* at 2. Forest River policy requires a certification in all situations where an

3

employee takes health-related leave,[2] but Besinger left both boxes blank. *Id.* He would later assert this was an "administrative error." (ECF No. 26-2, at 18:18–24). Murphy's FMLA leave began a few days later. (ECF No. 28-8, at 2).

Four days into his leave, Murphy sent a "Safety Plan" to Forest River's HR for review. (ECF No. 26-1, at 87–90). The plan described how Murphy could identify triggers and warning signs, use coping strategies, contact certain people, and do certain activities to avoid future anger outbursts. *Id.* It did not say Murphy was safe to return to work. *Id.* Lizarazo promptly informed Murphy that the Safety Plan was likely insufficient, a conclusion Besinger also reached a couple of weeks later. (ECF No. 26, ¶¶ 78–79). After notifying Murphy of this, Besinger worked to connect him with professionals who could provide the certification he needed. (ECF Nos. 28-9, 28-15). He also clarified the request, saying Forest River needed "a healthcare provider to tell us you are not a threat to yourself or others and that you are able to return to work." (ECF No. 28-9). Murphy emailed Besinger over the next week to tell him he attended group therapy and update him on efforts to schedule other appointments. (ECF Nos. 28-13, 28-15). The parties did not speak again more than a month. (ECF No. 28, ¶¶ 172–73).

In early September, Besinger emailed Murphy a letter and a questionnaire. (ECF No. 28-11, at 2–5). The letter notified Murphy that his FMLA leave was about to expire and directed him to have a healthcare professional fill out the questionnaire within the next five business days. *Id.* at 4. The questionnaire asked whether Murphy could safely return to work and, if so, whether he would only be able to do so with restrictions. *Id.* at 5. By the time Murphy received this email, he had already accepted another job. (ECF No. 28, ¶ 86). Even so, he sent a long reply which expressed

---

[2] "If you take leave because of your own serious health condition[,] . . . you are required, as are all employees returning from other types of medical leave, to provide medical certification that you are fit to resume work. . . . [Y]ou will not be permitted to resume work until it is provided." (ECF No. 26-1, at 73).

4

frustration about being put on leave, accused Forest River of not being clear with him about how he could return to work, and stated his intention to retain counsel. (ECF No. 28-11, at 1–2). Besinger respected his wish to seek counsel but noted that they were "in this situation because [Murphy] threatened to shoot [Forest River's] IT team in front of multiple witnesses." *Id.* at 1.

Besinger wrote Murphy a few weeks later saying that he had still not received the questionnaire. (ECF No. 28-14). He said Murphy would be fired in one week if he could not provide the questionnaire and explain why there was a delay. *Id.* Murphy let the deadline pass, and he was fired. (ECF No. 26, ¶¶ 87–95).

Murphy then sued Forest River, alleging disparate treatment and failure to accommodate under the ADA as well as retaliation and interference under the FMLA. (ECF No. 1). Forest River now moves for summary judgment on all claims. (ECF No. 24).

**II.     Summary Judgment Standard**

Summary judgment is appropriate if a moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When reviewing a motion for summary judgment, evidence must be viewed in the light most favorable to the non-moving party. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). Put another way, a court will only grant summary judgment "if, on the evidence presented, no reasonable juror could return a verdict in [the non-moving party's] favor." *Sorensen v. WD–40 Co.*, 792 F.3d 712, 722 (7th Cir. 2015).

The Court does not supersede the jury's role in making credibility determinations and weighing the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This is especially true in employment discrimination cases, where "issues of intent and credibility are especially crucial." *Wright v. Ill. Dep't of Corrs.*, 204 F.3d 727, 730 (7th Cir. 2000). And of course,

5

"a court may consider only admissible evidence in assessing a motion for summary judgment."[3] *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

### III. Discussion

Murphy argues Forest River is liable for disparate treatment and failure to accommodate under the ADA. He also asserts Forest River engaged in interference and retaliation in violation of the FMLA. The Court addresses each claim in turn.

#### A. Murphy's ADA Disparate Treatment Claim

To prove his ADA disparate treatment claim, Murphy must show that "(1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016). The ADA's text defines a "disability" as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(1). An individual is "regarded as having" a disability if they are discriminated against "because of an actual or perceived physical or mental impairment" regardless of whether "the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

---

[3] The Court notes this because both sides contest the admissibility of some facts and exhibits on hearsay grounds. (ECF Nos. 28, 30). Many objections relate to two things: (1) notes of conversations a Forest River HR employee had with Murphy's co-workers and (2) purported quotes from various meetings after the incident. *Id.* The Court believes it does not need these facts and statements to reach its decision. Accordingly, the Court will not mention statements alleged to be hearsay unless a basis exists in the record for admitting them that would not pose a hearsay issue. *See, e.g.*, footnote 1 of this opinion.

6

Here, the parties dispute whether Murphy is disabled. To suggest he is not, Forest River points out that Murphy never told them he was disabled, never referenced a disability when requesting accommodations, and has not claimed to be disabled to either his new employer or the National Guard. But the record shows Murphy had been diagnosed with major depressive disorder and anxiety years before the incident. (ECF No. 28-6, at 8–10). He was also on medication for those conditions. *Id.* at 10. And although Murphy never explicitly proclaimed himself disabled in the months of back-and-forth dialogue with Forest River, much of it centered around him going to therapy, Forest River communicating with his therapist, and Forest River trying to connect him with a psychologist. (ECF Nos. 28-9, 28-15, 28-16). Given this context, a jury could reasonably conclude that Forest River knew Murphy was disabled or regarded him to be.

But Murphy's real or perceived disability is only relevant to his ADA claim if he was still "otherwise qualified" to do his job and his firing "was *caused by* his disability." *Roberts*, 817 F.3d at 565 (emphasis added). These two prongs are where the rubber of Murphy's claim fails to meet the road.

*First*, precedent is clear: "threatening other employees disqualifies one" from protection under the ADA. *Palmer v. Cir. Ct. of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997). Any rule to the contrary "would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone." *Id.* "[R]etention of such an employee would" also "cause justifiable anxiety to coworkers and supervisors." *Id.* at 353. All these concerns laid out in *Palmer v. Cir. Ct. of Cook Cnty., Ill.* are relevant to Forest River's decision to fire Murphy.

While Murphy attempts to distinguish his case from *Palmer* and its progeny, he does not do so convincingly. Sure, *Palmer* and another case Forest River relies on, *Felix v. Wis. Dep't of*

*Transp.*, 828 F.3d 560 (7th Cir. 2016), both involve more factually extreme scenarios. *Palmer* featured an employee who repeatedly targeted a specific supervisor for six months, threatening to assault and kill her multiple times even after being suspended and transferred to a new location. 117 F.3d at 351–52. And in *Felix*, an employee with a known and accommodated disability cut herself in the bathroom and uttered alarming statements that seemed both suicidal and made her co-workers feel unsafe.[4] 828 F.3d at 563–64. That employee had to undergo an independent medical examination before returning to work, and the results indicated she still posed a heightened risk for violence against herself or her co-workers. *Id.* at 564–65. But these are distinctions of degree, not substance. Like the plaintiffs in *Palmer* and *Felix*, Murphy threatened his co-workers with violence. He can dispute the intent behind his statements. He can insist that he was "just blowing off steam." He cannot change the fact that the words were said.

*Second*, the causation element is a "but for" test. This means Murphy must show that Forest River "would not have fired him but for his actual or perceived disability; proof of mixed motives will not suffice." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010). And because the Court is ruling on Forest River's motion for summary judgment, "the ultimate question . . . is '[w]hether a reasonable juror could conclude that [Murphy] would have kept his job if he [was not disabled], and everything else had remained the same.'" *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019) (alterations in original) (quoting *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)).

---

[4] Felix's supervisor recalled hearing her say "[y]ou all hate me ... they all hate you ... everybody hates you" and "[t]hey think you're crazy ... you all think I'm crazy ... they want to get rid of you." also said, "I want my insurance ... they will take your insurance ... don't let them take your insurance ..." *Felix*, 828 F.3d at 563–64. She also blurted out "I need to get my money—don't take my money ... they don't trust you ... they steal your money," "[t]hey're too dull ... the knives were too dull," and "God let me die ... I just want to die." *Id.* at 564.

On this prong, Murphy argues that his claim should survive summary judgment because there is a genuine dispute over "whether Forest River genuinely believed Murphy was a threat requiring termination." (ECF No. 27, at 10). To press the point, Murphy highlights facts that would seem to downplay how seriously Forest River perceived his conduct and minimize the threat he could have practically posed. *Id.* But this argument does not address the relevant legal issue. The only inquiry for this Court is whether a reasonable juror could conclude Murphy would have kept his job but for his real or perceived disability.

Disabled or not, Murphy concedes that his threats of violence gave Forest River grounds to fire him. (ECF No. 28, ¶¶ 96–97). To think that played no role in Forest River's decision to terminate him is inapposite. And because "proof of mixed motives [does] not suffice," *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d at 962, Murphy would have to establish not only that Forest River fired him because he was disabled, but that the company did not even consider his objectively fireable offense when doing so. This Court cannot conceive of a jury that could make such a finding.

Nor can Murphy effectively argue that Forest River did not actually take the statements made during his tirade seriously. Murphy owned more than two dozen firearms at the time of his outburst, a fact well-known by other Forest River employees. (ECF No. 26, ¶¶ 31–34). He even had a gunsmithing business that he handed out business cards for at the office. *Id.* ¶¶ 33–34. Of course, Murphy is entitled to legally own firearms. It also means he had the instruments to carry out his threats. And Murphy himself concedes that his co-workers had reasons to be concerned about what he said.[5] *Id.* ¶ 45.

---

[5] The Court does not rely on the statements made by Murphy's co-workers to Forest River HR, which Murphy argues are hearsay. It only notes Murphy's admission to this in his own deposition. (ECF No. 26-1, at 23:14–20).

Accordingly, viewing the evidence in the light most favorable to Murphy, the Court concludes he has not presented any genuine dispute of material fact and his ADA disparate treatment claim fails as a matter of law.

### B. Murphy's ADA Reasonable Accommodation Claim

The Court need not dwell much on Murphy's failure to accommodate claim. To prevail, Murphy must show (1) he was a qualified individual with a disability; (2) Forest River was aware of his disability; and (3) Forest River failed to accommodate his disability reasonably. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019).

As discussed above, even if Murphy is disabled, he is not a "qualified individual." He lost that status when he shouted for his co-workers to be shot. Because he cannot succeed on that prong, he cannot prove his case even if Forest River was aware of his disability and failed to accommodate it.[6] Further, Forest River engaged in good faith in the interactive process prescribed by the ADA. The company spoke with Murphy and Albano. When Forest River rejected Albano's suggestion that Murphy work remotely, the company claimed such an arrangement was incompatible with his job. (ECF No. 26, ¶¶ 68–69). Maybe it was, maybe it was not. Either way, Albano *did not* say remote work was necessary to accommodate Murphy's disability. If that is what she meant, she could have said so. And if remote work—or anything else for that matter—was necessary to accommodate Murphy, Forest River gave him three months to have Albano or another healthcare provider say so. The company even gave him a form for a healthcare provider to fill out where any work restrictions could be identified. (ECF No. 28-11, at 5).

---

[6] Forest River's decision not to fire Murphy right away does not work against them. The company's authority to terminate Murphy's employment was not a use-it-or-lose-it proposition when the incident took place. They chose to investigate first, put him on leave while doing so, and chose to go ahead with letting him go. Even if the Court could view what happened and glean out a fact pattern where Forest River fired him for being disabled, he was still not a qualified employee, and Forest River's original grounds to fire him did not disappear.

At every avenue, Murphy either failed to satisfy a reasonable request from Forest River or failed to tie accommodation requests to his disability. ADA "regulations envision an interactive process that requires participation by both parties." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). That process requires "a great deal of communication," *Bultemeyer v. Fort Wayne Comm. Sch.*, 100 F.3d 1281, 1285 (7th Cir.1996)," and "a party that obstructs or delays the interactive process is not acting in good faith." *Beck*, 75 F.3d at 1135. While Murphy communicated with Forest River, his messages were not responsive to what the company needed to return him to work. Forest River solely sought assurance that Murphy could return to work without being a danger to himself or others. The company tried to facilitate care and streamline the process of getting that assurance. But despite these efforts, Murphy never did what was asked of him. Nor did he present any new information to verify his purported need for a work-from-home accommodation. These failures effectively thwarted the interactive process.

Thus, Murphy's reasonable accommodation claim also fails.

**C.    Murphy's FMLA Claims**

Murphy also claims that Forest River violated his FMLA rights, alleging both interference and retaliation. He argues several actions by Forest River prove his claims, including that Besinger improperly forced him to take involuntary leave; that the company wrongly refused to reinstate him; that the company could not require him to provide a fitness-for-duty certification because Besinger did not check the box for that on his FMLA designation notice; and that the company retaliated against him by firing him.

**1.    FMLA Interference**

To establish an interference claim, Murphy must show (1) he was eligible for FMLA protection, (2) the FMLA covered Forest River, (3) he was entitled to FMLA leave, (4) he gave

11

enough notice of his intent to take leave, and (5) Forest River denied him FMLA benefits he was entitled to. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006).

Forest River placed Murphy on FMLA leave on its own accord, so no one disputes that the first, second, and third prongs are satisfied. For the same reason, the fourth prong is irrelevant. Thus, Murphy's entire claim hinges on whether Forest River denied him benefits he was entitled to. He argues—without citing any supporting caselaw—that involuntarily putting him on leave, refusing to reinstate him, and requiring a medical certification without having checked the box on a form each provide him a viable interference claim. None of them do.

In opposing Forest River's motion for summary judgment, he spilled significant ink quibbling with one case Forest River cited, *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161 (2d Cir. 2006), and contends no caselaw gave Forest River authority to certify Murphy's FMLA leave. Murphy is right that *Sista*, a Second Circuit case, does not bind the Court. (ECF No. 27, at 23). Still, the Court agrees with its assertion that the FMLA "says nothing about an employer's ability to 'force' an employee to take such leave, and such forced leave, by itself, does not violate any right provided by the FMLA." *Sista*, 445 F.3d at 175 (citing 29 U.S.C. §§ 2611 et seq.). Yet Murphy still insists that being involuntarily placed on FMLA leave was itself an FMLA violation.

To the contrary, most courts have held that forced FMLA leave does not deny an employee FMLA benefits unless "the employee's leave was exhausted before claiming interference." *McManus v. Saint Mary's Coll.*, 611 F. Supp. 3d 586, 598 (N.D. Ind. 2020). Murphy exhausted his leave here, but typically "an involuntary-leave interference claim ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past." *see also Huffman v. Speedway LLC*, 621 Fed. App'x 792, 797 (6th Cir. 2015) (internal quotations omitted). Murphy does not argue that his

12

exhaustion created an inability to take more FMLA leave in the future. Rather, he maintains that the forced leave alone establishes claim. Murphy's complaint that he was *granted* benefits, albeit unwillingly, cannot on its own prove he was *denied* those benefits.

Murphy was also not entitled to reinstatement. The FMLA provides that an employee returning from leave "shall be entitled ... to be restored by the employer to the position of employment held by the employee when the leave commenced" or "an "equivalent position." 29 U.S.C. §§ 2614(a)(1)(A), (B). But the "right to reinstatement is not absolute." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010); *see also* 29 C.F.R. § 825.216 ("An employee has no greater right to reinstatement . . . than if the employee had been continuously employed during the FMLA leave period."). Rather, "regardless of whether [an employee] exercised FMLA rights," they are "not entitled to reinstatement" when they are "discharged for poor performance or because of disruptive conduct in the workplace." *Felix v. Wisc. Dep't of Transp.*, 104 F. Supp. 3d 945, 958 (E.D. Wisc. 2015). Because Murphy's threats gave Forest River grounds to fire him, Forest River's failure to reinstate him did not deny him FMLA benefits.

Lastly, Murphy argues that if Forest River required Murphy to provide a fitness-for-duty certification before returning to work, the company would have had to give him notice of that requirement in writing with his FMLA designation notice.[7] On the designation notice itself, there are two boxes side-by-side, one saying a certification "will be" required and another saying one "will not be." (ECF No. 28-8, at 2). Besinger left both

---

[7] *See* 29 C.F.R. § 825.300(d)(3)–(4) ("If an employer will require the employee to present a fitness-for-duty certification to be restored to employment, the employer must provide notice of such requirement with the designation notice. . . . The designation notice must be in writing."); *id.* § 825.312(b) ("An employer may seek a fitness-for-duty certification only with regard to the particular health condition that caused the employee's need for FMLA leave. The certification from the employee's health care provider must certify that the employee is able to resume work."); *id.* § 825.312(d) ("The designation notice required in § 825.300(d) shall advise the employee if the employer will require a fitness-for-duty certification to return to work."). In his brief, Murphy only argues that the box on his FMLA designation notice would have needed to be checked. (ECF No. 27, at 12, 16). Since this opens the door to roughly the same analysis anyway, the Court construes the argument more broadly in this way.

13

boxes blank. *Id.* No other contemporaneous writing laying out fitness-for-duty requirements has been produced. Although Besinger attributes this omission to "administrative error," (ECF No. 26, ¶ 72), the Court must view the facts in the light most favorable to Murphy. Thus, the Court assumes—for the purpose of this opinion—that Forest River failed to provide written notice.

But employers need not provide written notice if their handbook contains leave policies that clearly specify when fitness-for-duty certifications are required. 29 C.F.R. § 825.300(d)(3). Forest River had such a policy, and it applied to Murphy, so Forest River only needed to provide Murphy oral notice of the policy. *Id.* Murphy insists Forest River only informed him of this requirement later and that no one ever told him what exactly he needed to provide. To support these assertions, he points only to Forest River's failure to check a box on his designation notice, an email he sent nearly three months into his leave, and cherry-picked deposition excerpts meant to imply Forest River's HR employees did not know what they were asking for. (ECF No. 28-8, at 2; No. 28-11, at 2; No. 27, at 16–18). This evidence is scant. More importantly, it fails to mention Forest River's request, made the day before putting Murphy on leave, for "something, anything . . . saying that . . . [he] was able to return to work" and "wouldn't harm himself or someone else." (ECF No. 28, ¶ 67, 151). This, combined with the ensuing months of communications, heavily suggests he received oral notice.

Even if Forest River failed to comply with the FMLA notice requirements, that only constitutes interference if Murphy shows "some impairment of his rights and resulting prejudice." *Barrett. v. Ill. Dep't of Corrs.*, 803 F.3d 893, 898 (7th Cir. 2016) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 122 (2002)); *see Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 764 (7th Cir. 2008) (holding that an employer's failure to provide notice did not constitute interference because it did not prejudice the employee). Murphy cannot make such a

showing. Forest River's preexisting grounds for firing Murphy already negated his right to reinstatement. *Felix*, 104 F. Supp. 3d at 958. And despite Murphy's accusations that Forest River kept moving the goalposts, he immediately behaved as if he understood at least roughly what would satisfy Forest River's requirements.

The day before being put on leave, Murphy knew Forest River wanted something saying he was safe to return to work. (ECF No. 28, ¶ 67). Within days of being placed on leave, Murphy sent his "Safety Plan" to Besinger and Lizarazo for review. (ECF No. 26-1, at 87–90). This sparked a months-long dialogue, which involved many efforts from Forest River to help Murphy submit what he needed. After deeming the Safety Plan insufficient, Besinger stated Forest River's request more clearly.[8] The company offered to connect him with healthcare professionals who could provide that certification. (ECF Nos. 28-9, 28-15). Forest River even sent Murphy a questionnaire he could give to a healthcare provider of his choosing, which included questions about whether he could safely return to work and, if so, whether he could only do so with restrictions. (ECF No. 28-11, at 5).

Despite more than four months passing after the incident—three of which were spent on leave— Murphy could not provide this basic assurance. (ECF No. 28, ¶¶ 90–95). He was warned when his leave would expire and when he would be fired if he did not satisfy Forest River's request.[9] (ECF No. 28-11, at 4; No. 28-14). Murphy let both deadlines pass, and he was fired. *Id.* ¶¶ 87–95.

Given the extent of these discussions, Murphy's behavior, the passage of time, and the efforts made by Forest River, the Court concludes that a reasonable jury cannot find that Forest

---

[8] "We need a healthcare provider to tell us you are not a threat to yourself or others and that you are able to return to work. If the provider has concerns about you returning to work, we can discuss what the provider recommends." (ECF No. 28-9).
[9] Of course, Forest River did not know Murphy had accepted another job. (ECF No. 28, at ¶ 86).

15

River failed to provide Murphy notice of the certification requirement. And even if one could, that factual dispute is immaterial because Murphy's rights were not prejudiced. Accordingly, this too cannot constitute a claim for FMLA interference.

### 2. FMLA Retaliation

Murphy's FMLA retaliation claim also fails. An employee has a retaliation claim if they can show that their employer fired them or otherwise retaliated against them for exercising FMLA rights. 29 U.S.C. § 2615(a)(2). This can be demonstrated either directly or indirectly. *Burnett v. LFW Inc.*, 472 F.3d 471, 481–82 (7th Cir. 2006). But because Murphy has identified no other Forest River employee treated differently in similar circumstances, he must prove his retaliation claim directly. *Id.* at 482.

Under the direct method, Murphy must show "(1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). Murphy took FMLA leave, and Forest River fired him, so the Court's only focus is on the causal link. To prove causation, Murphy must show evidence that Forest River "took materially adverse action against him on account of his protected activity." *Burnett*, 472 F.3d at 481. Essentially, Forest River would have to directly admit it fired Murphy for taking FMLA leave, or Murphy would have to paint "a convincing mosaic of circumstantial evidence" allowing this Court to make that inference. *Pagel*, 695 F.3d at 631; *Ridings*, 537 F.3d at 771.

Here, Forest River has made so much admission, and Murphy points to no evidence suggesting he was fired *for taking FMLA leave*. He only alleges Forest River fired him because of his disability. (ECF No. 27, at 24–25). In fact, Murphy's FMLA complaint largely lies in being forced to use the benefits in the first place. *Id.* The Court has explained why that does not constitute

interference, and it is impossible to conceive that Murphy was fired for using the benefits he did not want to take. Thus, like all other claims, Murphy's retaliation claim fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Forest River's Motion for Summary Judgment (ECF No. 24) is GRANTED.

**SO ORDERED** on September 29, 2025.

                                              s/ *Holly A. Brady*
                                             CHIEF JUDGE HOLLY A. BRADY
                                             UNITED STATES DISTRICT COURT